

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Devlin N. Su (312) 886-0667

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LUIS CONTRERAS | CASE NUMBER:<br><br>UNDER SEAL |

**FILED**
AUG 09 2018
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

18 CR 486
MAGISTRATE JUDGE VALDEZ

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about February 27, 2018, to on or about March 1, 2018, at Joliet, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 846 | Did knowingly and intentionally conspire to possess with intent to distribute and to distribute a controlled substance, namely, 500 grams or more of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

BRIAN PROCHASKA
Task Force Officer, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: August 9, 2018

*Judge's signature*

City and state: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT | ss
NORTHERN DISTRICT OF ILLINOIS |

## AFFIDAVIT

I, BRIAN D. PROCHASKA, being duly sworn, state as follows:

## I. INTRODUCTION

1. I am a Task Force Officer with the Federal Bureau of Investigation ("FBI") and have been so employed since approximately January 2014. I am currently assigned to the FBI's South Resident Agency, and my responsibilities include the investigation of violent crimes and narcotics trafficking offenses. I have been employed by the Joliet Police Department for the past 18 years, with over 14 years of experience investigating gang, firearms, and narcotics offenses.

2. I have received specialized training in drug investigations while employed as a Joliet Police Officer and a FBI Task Force Officer. I am familiar with and have participated in all of the normal methods of investigations, including but not limited to undercover purchases of narcotics, visual surveillance, general questioning of witnesses, informant and cooperating witness debriefings, pen registers, document analysis, and utilization of undercover agents/officers. I have been personally involved in investigations of drug-related offenses involving the possession, sale, and distribution of cocaine, heroin, and crack cocaine in the south suburbs of the Chicago metropolitan area, and investigations involving the distribution of these substances by members of street gangs in the south suburbs of the Chicago metropolitan area.

3. I have also received specialized training in the enforcement of federal narcotics laws, and have been involved in numerous aspects of narcotics trafficking investigations, including: (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from drug trafficking; (b) surveillance; (c) analysis of documentary and physical evidence; and (d) participating in undercover narcotics investigations.

4. This affidavit is submitted in support of a criminal complaint alleging that LUIS CONTRERAS did knowingly and intentionally conspire with INDIVIDUAL A, and with others known and unknown, to possess with intent to distribute and distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846 (the "**Subject Offense**").

5. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging CONTRERAS with committing the **Subject Offense**, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that defendant committed the offenses alleged in the complaint.

6. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents; telephone records; court-authorized

interceptions of communications; physical and electronic surveillance; and a seizure of controlled substances.

## II. SUMMARY OF THE INVESTIGATION

7. Law enforcement has been investigating WILLIAM NOBLES, a self-identified Black Gangster Disciple, for trafficking cocaine and other controlled substances in the Joliet, Illinois area. Through court-authorized interceptions of NOBLES's communications[1] and corresponding surveillance, law enforcement identified INDIVIDUAL A as one of NOBLES's cocaine suppliers, and CONTRERAS as INDIVIDUAL A's courier to/from NOBLES. On or about February 27, 2018, NOBLES met INDIVIDUAL A to receive a sample of cocaine from INDIVIDUAL A. On or about February 28, 2018, law enforcement intercepted communications between INDIVIDUAL A, CONTRERAS, and NOBLES indicating that INDIVIDUAL A and CONTRERAS supplied a kilogram of cocaine to NOBLES. After the delivery of the kilogram, intercepted communications between NOBLES and a cocaine associate of his, JARON NABORS, coupled with a seizure of cocaine from NABORS's courier, PRUITTE, confirmed that NOBLES received the cocaine from

---

[1] On or about January 25, 2018, Chief Judge Ruben Castillo, Northern District of Illinois, signed an order authorizing the initial interception of wire and electronic communications over (779) 205-9756 ("Target Phone 6"). On or about February 26, 2018, Acting Chief Judge Amy J. St. Eve, Northern District of Illinois, signed an order authorizing the continued interception of wire and electronic communications over Target Phone 6, and the initial interception of wire and electronic communications over (708) 289-6155 ("Target Phone 7").

INDIVIDUAL A and CONTRERAS and subsequently supplied it to PRUITTE and NABORS.[2]

## III. FACTS SUPPORTING PROBABLE CAUSE

### A. INDIVIDUAL A's Distribution of a Sample of Cocaine to NOBLES on February 27, 2018

8. On or about February 27, 2018, NOBLES and INDIVIDUAL A arranged to meet so that INDIVIDUAL A could provide NOBLES with a sample of cocaine. At 1:30 p.m. (Session #2152), NOBLES, who was using Target Phone 6,[3] had a conversation with INDIVIDUAL A, who was using Target Phone 7.[4] NOBLES said, "What up, [INDIVIDUAL A]?"[5] INDIVIDUAL A responded, "I'm alright, I'm alright,

---

[2] NOBLES, NABORS, and PRUITTE are charged in separate criminal complaints in the Northern District of Illinois.

[3] I believe that NOBLES is the user of Target Phone 6. On or about March 28, 2018, law enforcement conducted a court-authorized search of NOBLES's residence at 809 Vine Street, Apartment 2B, in Joliet. A law enforcement agent familiar with NOBLES's voice from speaking to him during the search-warrant execution on his residence has positively identified the voice of the user of Target Phone 6 as NOBLES.

[4] The identification of INDIVIDUAL A as the user of Target Phone 7 is based on the following. First, as discussed below, on or about February 27, 2018, NOBLES arranged a meeting with the user of Target Phone 7 at a Walmart that INDIVIDUAL A attended. Second, the following day, the user of Target Phone 7 arranged a meeting at a hot dog restaurant that INDIVIDUAL A attended. Because INDIVIDUAL A showed up to these two separate meetings at the times and places arranged by the user of Target Phone 7, I believe that INDIVIDUAL A is the user of Target Phone 7.

[5] Throughout this affidavit, I describe various conversations that were intercepted pursuant to court orders. These descriptions often include my understanding of what is being said during such conversations in brackets or otherwise. This understanding and interpretation of the conversations is based on (i) the content and context of the conversations, (ii) my experience and my fellow agents' experiences as law enforcement officers, including our experience observing written conversations as a whole, and (iii) the investigation to date. The summaries of the conversations set forth in this affidavit are based on draft—not final—transcriptions. Finally, the summaries contained herein do not include all potentially criminal communications intercepted, or topics covered during the course of the intercepted conversations.

hey, I'ma on way to go take some pictures of this other engine [get a sample of cocaine] and shit um, you want me to bring you pictures so you can see it [bring you a sample so you can inspect it]? Or is he not interested in that motor anymore [is your customer not interested in buying cocaine anymore]?" NOBLES replied, "No, we can always as long as we can, you know, I think if we can pique his interest we can get him back, it's just about having, you know something he can deal with [NOBLES's customer is interested in buying cocaine]." INDIVIDUAL A said, "Yeah, cause there's that other type of one, ah, engine [different type of cocaine] and shit, I'm gonna go, go to A-town right now real quick and ah um, I'll call you, maybe we can meet somewhere and I'll, I'll, let you see it [show NOBLES the sample]." NOBLES responded, "Ok hit me up."

9. At approximately 4:05 p.m. (Session #2162), NOBLES, who was using Target Phone 6, had a conversation with INDIVIDUAL A, who was using Target Phone 7. In the conversation, they arranged to meet at a store to distribute the sample of cocaine. INDIVIDUAL A said, "You wanna meet at Menards, I gotta go to Menards real quick." NOBLES responded, "Okay I can go yeah I can try Walmart then cause I gotta go get a birthday cake. . . . Well my question to you is I got somebody that want a nine [NOBLES knows of someone who wants nine ounces of cocaine; as discussed below in paragraph 19, JARON NABORS ordered nine ounces of cocaine from NOBLES]. And, uh, if everything check out, how long will it take you to get to it [how long will it take for INDIVIDUAL A to supply the cocaine]?" INDIVIDUAL A responded, "If everything check out what?" NOBLES replied, "How long will it take you to get to it." INDIVIDUAL A stated, "Oh that's what I was going to talk to you

5

about. Um cause my guy like yeah tell him to get to it right away that way we can uh we can do everything today [INDIVIDUAL A can do the deal today]. . . . Yeah so it just depends on how long it's going to take you to test drive it [inspect the sample] and shit." NOBLES stated, "Okay well I can take that right to somebody. What basically do, I can run it right dude whole and I'll find a brother if I have to [NOBLES can inspect the sample right away]."

10. After some additional communications, at approximately 5:23 p.m. (Sessions #2174, 2180), INDIVIDUAL A and NOBLES arranged to meet in a Walmart. At about 5:15 p.m., law enforcement surveillance observed INDIVIDUAL A (who was positively identified from a known photograph of INDIVIDUAL A) arrive at a Walmart parking lot located at 2424 W. Jefferson St in Joliet, Illinois. Surveillance positively identified NOBLES arrive there at 5:30. Surveillance observed NOBLES exit the Walmart at 5:45 p.m. and drive away. Although law enforcement surveillance did not observe a meeting inside the Walmart between NOBLES and INDIVIDUAL A, at approximately 7:13 p.m. (Session #2195), NOBLES texted INDIVIDUAL A, "A-1 [the sample of cocaine is good]." Based on my training and experience, including my knowledge of the results of surveillance and of these and other interceptions (including the interceptions discussed below), I believe that INDIVIDUAL A distributed a sample of cocaine to NOBLES at the Walmart on or about February 27, 2018.

11. At approximately 7:24 p.m. (Session #2203), NOBLES, who was using Target Phone 6, had a conversation with INDIVIDUAL A, who was using Target

Phone 7, regarding the sample of cocaine. NOBLES stated, "I told you he had made a little move. So I don't know what he, I don't know how soon talkin what he got but I know have his brother check that lick and he, and uh, he froze up like a mummy [NOBLES doesn't know when his customer wants the cocaine, but the customer liked the sample]. . . . So um, all I can do is try to get on him and ride him and see, where we talkin and what we talkin [NOBLES needs to check with his customer to see how much cocaine he wants and when he wants the cocaine], you know what I'm saying?" INDIVIDUAL A responded, "Yeah, the thing is that I just want to see where you're at or where you got it at or whatever so I can swap the ones I have there, I'm going to swap them out regardless, you know [INDIVIDUAL A wants to swap cocaine]. . . . Um, and I don't know what you, how much you looking at to get, one or two [how much cocaine NOBLES wants from INDIVIDUAL A]." NOBLES replied, "Yeah, well, see that's what I'm saying, I don't know cause he, he just a move not long ago [NOBLES's customer recently bought drugs so NOBLES doesn't know how much the customer wants]. . . . So, I don't know what his finances, like, he ain't really going tell me all of that. I'm just going to keep driving on him to see what's what, but I, I think later on, I'm saying right now I got somebody that want nine [NABORS wants nine ounces of cocaine from NOBLES] and then I almost got enough for a half [NOBLES almost has enough money to purchase a half-kilogram of cocaine]. If you want to do it or you just want to wait and do the whole thing [INDIVIDUAL A can supply NOBLES with nine ounces of cocaine or can supply NOBLES with a whole kilogram of cocaine], it's on you." INDIVIDUAL A stated, "Well probably be until tomorrow, is

7

that cool?" NOBLES stated, "Yeah, bright and early though cause this nigga ain't going to let me hold his money too long."

### B. INDIVIDUAL A and CONTRERAS's Distribution of a Kilogram of Cocaine to NOBLES on February 28, 2018

12. On or about February 28, 2018, beginning at approximately 11:26 a.m. (Session #2231), NOBLES, who was using Target Phone 6, had a text-message conversation with INDIVIDUAL A, who was using Target Phone 7. During the conversation, NOBLES told INDIVIDUAL A that he would be home in 30-40 minutes. At approximately 12:13 p.m. (Session #2234-35), INDIVIDUAL A asked, "On his way [the courier is on his way] cool?" NOBLES responded, "15 mins [NOBLES would be home in 15 minutes]."

13. At approximately 12:21 p.m. (Session #213), INDIVIDUAL A, who was using Target Phone 7, had a conversation with CONTRERAS, who was using (815) 514-6803 ("Contreras Phone 1").[6] INDIVIDUAL A stated, "Hey, he [Nobles] says ten more minutes. Do you want to stop and get something to eat real quick? . . . Stop right there uh at the hot dog, at the hot dog shop right there by the cemetery." Law enforcement surveillance subsequently positively identified INDIVIDUAL A and CONTRERAS meet at Hey Hot Dog restaurant at 601 Ruby Street in Joliet, which is located approximately 0.3 miles away from NOBLES's residence at 809 Vine Street. Based on my training and experience, including my knowledge of the results of this

---

[6] I believe that CONTRERAS is the user of Contreras Phone 1 because, as discussed below, INDIVIDUAL A arranged a meeting with the user of Contreras Phone 1 at a hot dog restaurant on February 28, 2018, and law enforcement surveillance subsequently observed INDIVIDUAL A and CONTRERAS meeting at that restaurant.

surveillance and of these and other interceptions, I believe that INDIVIDUAL A and CONTRERAS met near NOBLES's residence to discuss an impending distribution of cocaine to NOBLES.

14. At 12:29 p.m. (Session #2236), NOBLES, who was using Target Phone 6, told INDIVIDUAL A, who was using Target Phone 7, that NOBLES had arrived at home. Meanwhile, law enforcement surveillance observed NOBLES pull into the residence in a white pickup truck at approximately 12:25 p.m. At approximately 12:46 (Sessions #2237-40), INDIVIDUAL A stated, "Ok, we stopped for some hot dogs. . . . He [Contreras] should be there in less than 5 mins. Matter a fact just wait outside he should be pulling up." Law enforcement surveillance subsequently observed CONTRERAS pull up to the back of 809 Vine Street in the same vehicle that law enforcement observed him driving to meet INDIVIDUAL A at Hey Hot Dog. Surveillance then observed NOBLES come out of the building, enter the front passenger seat of CONTRERAS's car, and then return to the building.

15. At approximately 12:50 p.m. (Sessions #224-231), INDIVIDUAL A, who was using Target Phone 7, had a text-message conversation with CONTRERAS, who was using (815) 258-9218 ("Contreras Phone 2").[7] CONTRERAS stated, "Got it. With money [CONTRERAS picked up money from NOBLES]." INDIVIDUAL A responded, "Ok. Should be 14500 [$14,500]. Count them ASAP." Based on my training and experience, including my knowledge of the results of surveillance and of these and

---

[7] A law enforcement agent has listened to the recorded voices of both the user of Contreras Phone 2 and the user of Contreras Phone 1 and believes they are the same person: CONTRERAS.

9

other interceptions (including the interceptions discussed below), I believe that in this conversation, CONTRERAS told INDIVIDUAL A that he had delivered the cocaine and had picked up some money in exchange from NOBLES, and that INDIVIDUAL A responded that the correct amount of money should be $14,500.

16. At approximately 12:57 p.m. (Session #233), INDIVIDUAL A, who was using Target Phone 7, had a conversation with CONTRERAS, who was using Contreras Phone 2. INDIVIDUAL A asked, "Did the black guy [Nobles] tell you anything? No, right?" CONTRERAS responded, "Nah, he didn't say shit. He just said, 'I'll see you later.'" INDIVIDUAL A replied, "Yeah, cause I misunderstood him, that he only wanted the half [NOBLES only wanted a half-kilogram of cocaine, but INDIVIDUAL A told CONTRERAS to deliver a whole kilogram of cocaine]. But he's going to try to go ahead and move the other one [NOBLES is going to try to sell the additional cocaine that was delivered]. But if you want, call your guy, tell him that there's a half there [half-kilogram of cocaine with NOBLES], that he wanted available. If he's interested, it's there and if not, we'll just leave it, leave it there with dude [INDIVIDUAL A asked CONTRERAS to contact CONTRERAS's customer to see if the customer would be interested in buying the additional cocaine that INDIVIDUAL A mistakenly sent to NOBLES. If not, they would leave the additional cocaine with NOBLES]." CONTRERAS responded, "Alright, let me hit him up right now." INDIVIDUAL A replied, "Alright then, hey, but tell him, you had already told him that I was going to raise it right [INDIVIDUAL A is going to raise the price of cocaine on this customer]? From the first time." CONTRERAS stated, "Yeah, I told

10

him that it was going to go up the next time cause he fucked up. Yeah, I told his ass." INDIVIDUAL A responded, "So yeah, so give him the half for, give it to him for, what would that be, for 16, 16 1/2 [$16,000 or $16,500 for the half-kilogram of cocaine], around that." CONTRERAS asked, "What do you get, what are you getting off of it? 15 [INDIVIDUAL A would get $15,000 from the sale of the half-kilogram]?" INDIVIDUAL A replied, "Yeah, yeah, yeah, and then you get the other [CONTRERAS will get the rest from the sale]." CONTRERAS responded, "Alright, I'll tell him." Based on my training and experience, I believe that $16,000 or $16,500 was generally consistent with the market price for a half-kilogram of cocaine at the time.

17. At approximately 1:20 p.m. (Session #234), CONTRERAS, who was using Contreras Phone 2, called INDIVIDUAL A, who was using Target Phone 7, and stated, "Everything is there dude. Yeah, 14-5 [CONTRERAS has all $14,500 from NOBLES]."

18. At approximately 1:34 p.m. (Session #2251), INDIVIDUAL A, who was using Target Phone 7, had a conversation with NOBLES, who was using Target Phone 6. INDIVIDUAL A asked, "Hey, how much you said you gave dude [how much money did NOBLES give CONTRERAS]?" NOBLES stated, "Uh, fourteen five [$14,500]." INDIVIDUAL A responded, "Well, supposed to be fifteen [$15,000] wasn't it? Wasn't it supposed to be, you, you get half [NOBLES wanted a half-kilo], right?" NOBLES replied, "Yeah that's what, yeah I had told you half." INDIVIDUAL A responded, "Uh-huh. Ain't it supposed to be fifteen [$15,000]?" NOBLES said, "Right, that's what I said, I owe you five [$500]." INDIVIDUAL A said, "Yeah. You know what

11

happened, you know what I was thinking, cause, I told my cousin it was fourteen five [INDIVIDUAL A told CONTRERAS that NOBLES should have given CONTRERAS $14,500 for the cocaine] and shit, I was like, naw he probably gave fifteen and since I said fourteen five, he probably try to keep the other five [INDIVIDUAL A thought that CONTRERAS may have received $15,000 from NOBLES in exchange for the cocaine but kept $500 because he knew that INDIVIDUAL A was only expecting to receive $14,500 from NOBLES]." NOBLES stated, "No, that was all the change I had [NOBLES only had $14,500]. I owe you five [$500]."

### C. NOBLES's Subsequent Distribution of Cocaine to ERICKA PRUITTE and JARON NABORS on February 28, 2018

19. Law enforcement did not intercept any other communications over Target Phone 6 until approximately 2:39 p.m. (Session #2254). Then, NOBLES, who was using Target Phone 6, had a conversation with JARON NABORS, who was using 312-207-9610 ("Nabors Phone 7").[8] NABORS stated, "Do me a favor, put them, uh, all in two-points for me [NABORS asked NOBLES to package cocaine into 2.25-ounce packages]." NOBLES said, "Ok, alright, give me a second then." NABORS said, "You over your way [are you at home]? Unless you want her [a courier later identified as

---

[8] I believe that NABORS is the user of Nabors Phone 7. First, on or about December 10, 2017, law enforcement intercepted a call between between NOBLES and telephone number 708-571-5146 ("Nabors Phone 3"). In the conversation, NOBLES and the user of Nabors Phone 3 arranged for the user of Nabors Phone 3 to meet NOBLES at NOBLES's residence. Subsequently, law enforcement observed a red Chevrolet Impala being driven by NABORS (who was positively identified as NABORS from a known photograph of NABORS) enter the driveway of NOBLES's residence and then drive away. Because JARON NABORS appeared at the time and place of a meeting arranged by the user of Nabors Phone 3, I believe that NABORS was the user of Nabors Phone 3. And because law enforcement has listened to the voices of the users of Nabors Phones 3 and 7 and believe they both belong to the same person, I believe that NABORS is also the user of Nabors Phone 7.

PRUITTE] to bump into you somewhere else?" NOBLES said, "No, you gotta give me a minute to go do that." NABORS said, "Ok, so it will be four of them, right [four 2.25-ounce packages of cocaine, or nine ounces of cocaine]?" NOBLES responded, "Yep. You say you wanted, you say get the whole thing right?" Nabors replied, "Right, right, yeah."

20. At approximately 3:06 p.m. (Session #2256), NOBLES texted NABORS, "Send her [PRUITTE]." At 3:54 p.m. (Session #2262), NABORS called NOBLES and said, "She's pulling up." Meanwhile, toll records for Nabors Phone 7 showed that NABORS communicated with (312) 806-7176, later determined to be used by PRUITTE ("Pruitte Phone 1"),[9] at approximately 3:39 p.m. Those toll records further show that between 3:06 p.m. and 4:45 p.m., NABORS only communicated with Target Phone 6 (used by NOBLES) and Pruitte Phone 1 (used by PRUITTE).

21. According to a court-authorized search of Pruitte Phone 1 (which was seized from PRUITTE's purse as discussed below), at approximately 3:55 p.m., PRUITTE received a text message from NABORS, who was using Nabors Phone 7, stating, "Back [go to the rear of NOBLES's residence] bae." Around this time, law enforcement surveillance observed a Hyundai sedan back down the driveway to the rear of NOBLES's residence at 809 Vine Street. At approximately 3:58 p.m., NOBLES walked out of the building and got into the front passenger side. A minute later, NOBLES exited the car and went back into the building.

---

[9] I believe that PRUITTE is the user of Pruitte Phone 1 because during the traffic stop of PRUITTE discussed below, law enforcement seized Pruitte Phone 1 from a purse containing Pruitte's wallet and personal belongings that was inside the car.

13

22. After the Hyundai drove away from the residence, law enforcement observed the Hyundai speeding and stopped the Hyundai. The driver, identified from her driver's license as ERICKA PRUITTE, was the only occupant of the car. When asked if there was anything illegal in the car, PRUITTE stated that she had some marijuana. Additionally, during the stop, a narcotics canine subsequently alerted to the scent of narcotics on the passenger side of the car. In the front passenger seat were 250.6 grams, or approximately 9 ounces, of a mixture and substance containing cocaine in a yellow sandwich baggie box covered by a pillow. The cocaine was packaged in four packages, each weighing approximately 2.25 ounces, as requested by NABORS as discussed above in paragraph 19. In the backseat was a white grocery bag containing 155.3 grams of a mixture and substance containing cocaine base, 28.6 grams of a mixture and substance containing cocaine, and 40.1 grams of a mixture and substance containing heroin.[10] Law enforcement also seized Pruitte Phone 1 from a purse containing Pruitte's wallet and personal belongings that was inside the car.

23. PRUITTE was arrested and later read her *Miranda* rights. She waived them and agreed to speak to law enforcement. PRUITTE stated that the drugs were not hers and that she let someone borrow her car that day. She stated that she didn't know the drugs were there but that she had dropped someone off (she refused to say who), and that person must have put the drugs on her seat and covered it with a pillow on his way out of her car.

---

[10] All weights and identifications of substances are taken from chemical analyses performed by DEA North Central Laboratory.

24. Based on my training and experience, including (1) my knowledge of previous interceptions of NOBLES, INDIVIDUAL A, CONTRERAS, and NABORS; (2) surveillance of CONTRERAS's meeting with NOBLES; and (3) the close timing between when NOBLES met with CONTRERAS and then met PRUITTE, I believe that the cocaine that was seized from PRUITTE's vehicle was originally supplied by INDIVIDUAL A and CONTRERAS and destined for NABORS.

### *Subsequent Discussion Between NOBLES and INDIVIDUAL A About the Extra Cocaine*

25. On or about March 1, 2018, at 6:20 p.m. (Sessions #2337-42), NOBLES, who was using Target Phone 6, had a text-message conversation with INDIVIDUAL A, who was using Target Phone 7. In the conversation, they discussed the additional half-kilogram of cocaine that INDIVIDUAL A had mistakenly delivered to NOBLES. INDIVIDUAL A asked, "What up B?" NOBLES responded, "Nothing yet [no buyers for the extra cocaine]." INDIVIDUAL A replied, "That's fine I haven't got any calls on it yet so if you get some buyers go ahead [INDIVIDUAL A hasn't found any buyers either, so if NOBLES can find one he should go ahead and sell the extra]." NOBLES responded, "Ok." INDIVIDUAL A stated, "Figured being the first of the month [narcotics sales at the end of the month are slow leading up to the first week of the following month]." NOBLES stated, "Right."

### IV. <u>CONCLUSION</u>

26. Based on the above information, there is probable cause to believe that from on or about February 27, 2018, to on or about March 1, 2018, at Joliet, in the Northern District of Illinois, Eastern Division, and elsewhere, LUIS CONTRERAS

did knowingly and intentionally conspire with INDIVIDUAL A, and with others known and unknown, to possess with intent to distribute and to distribute a controlled substance, namely, 500 grams or more of cocaine, a Schedule II Controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

_____
BRIAN D. PROCHASKA
Task Force Officer, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on August 9, 2018.

_____
MARIA VALDEZ
United States Magistrate Judge